UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



ROBERT KALMAN
      Plaintiff,

CIVIL ACTION NO.  3:02-CV-02052 (JCH)

v.

ALEXANDER CARRE, ET AL.,
      Defendants,

August 17,  2004

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In accordance with Federal Rules of Civil Procedure the plaintiff Robert Kalman respectfully opposes the defendants, Alexander Carre, James Cassidy, Sean Hart and Susan McKinley, Motion for Summery Judgment.  The pro se plaintiff in the above-captioned matter is confined at Connecticut Valley Hospital in Middletown, Connecticut and he respectfully submits this brief in opposition to the defendants Motion for Summary Judgment.

## STANDARD FOR SUMMERY JUDGMENT

Pursuant to Rule 56(c), summary judgment shall be granted to the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law."

ORAL ARGUMENT REQUESTED

EVIDENTIARY HEARING REQUESTED

1

for past and potential future substance abuse, and would run afoul the Eighth Amendment to the United States Constitution. It should be noted that defendants also diagnosed plaintiff with substance dependence and not only without evidentiary support but also in direct contradiction to the evidence recommended plaintiff placed in maximum-security.

C). The plaintiff respectfully asks The Honorable Court to take judicial notice of the *specific and material fact* that defendant Alexander Carre, M.D., Attending Psychiatrist testified that the plaintiff is **"Certainly not mentally ill."** P. 87 at 6, on 12/17/02, BEFORE THE HONORABLE BRUCE W. THOMPSON S, JUDGE, in the matter of <u>State vs. Kalman</u>, Docket No. CR00-0491390S, <u>Plaintiff's Exhibit A..</u>

D). The plaintiff respectfully asks The Court to take judicial notice of the *specific material fact* that defendant Alexander Carre, M.D., Attending Psychiatrist, testified that "further observations over the next few months, it appeared to both treatment teams that Mr. Kalman had [no] **significant psychiatric disorder that would drive <u>him to be a danger to the community or himself.</u>"** 9/26/02 at 9, BEFORE THE HONORABLE HARPER JUDGE , <u>State v. Kalman</u>, Case No. 4920009, <u>Defendants' Exhibit J</u>.

E). The plaintiff respectfully asks The Court to take judicial notice of the specific material fact that defendant Alexander Carre, M.D., Attending Psychiatrist, testified that "[W]e have **not found any significant evidence of a mental disorder.** [W]e <u>simply</u> established the diagnosis of substance use disorder compounded with a personality disorder that put him at <u>risk</u> of offending in the community." P. 7 at 18 - 22, January 10, 2003, Before the Psychiatric Security Review Board of the State of Connecticut. <u>Plaintiff's Exhibit B</u>.

F). The plaintiff respectfully requests The Court to take judicial notice of the specific fact that Keith Scott, M.D., Attending Psychiatrist from Whiting Forensic Division testified in reference to the plaintiff's mental condition: **"And with reasonable medical probability, I would say that it is unlikely that he is going to reach the level of an [axis one.]"**Dr. Scott further testified that plaintiff's substance related diagnosis and personality disorder **"That does not place you under the board."**(Psychiatric Security Review Board).  12/16/02, BEFORE THE HONORABLE BRUCE W. THOMPSON JUDGE, in the matter of <u>State vs. Kalman</u>, Docket No. CR00-0491390S. <u>Plaintiff's Exhibit C</u>.

G). The plaintiff respectfully requests that The Court take notice of the following entry in plaintiff's medical record **"...he also states and I agree with him that he be better off in a drug rehab center rather then @ WFD since his problems center around his drug habits."** <u>C.V.H. Progress Note, Plaintiff's Exhibit D</u>.

3

The defendants assert in their Rule 56(a) (1), Statement in support of their Motion for Summary Judgment

a statement of material facts that they claim are not genuine issues to be tried.

The defendants state:

1. On October 30, 2001, the plaintiff Robert Kalman, was found not guilty by reason of mental disease or defect of the crimes of Illegal Possession of Explosives, Risk of Injury (two counts) and Failure to Appear, First Degree, pursuant to Conn. Gen. Stat. Sec., Sec., 53a-13 (Affidavit of Bryaman, March dated March 16, 2002, Exhibit A; also report to the Court, March 15, 2002, marked as Exhibit B).

2. The plaintiff was committed to the custody of the State of Connecticut, Department of Mental health & Addiction Services ("DMHAS"), at the Whiting Forensic Division of Connecticut Valley Hospital in order to proceed with an evaluation of the plaintiff regarding his mental status, pursuant to Conn. Gen. Stat. Sec., 17a-582 (Exhibit B).

3. Pursuant to subsection (b) of Conn. Gen. Stat. Sec., 17a-582, an examination of the plaintiff was conducted regarding the plaintiff's mental statutes (Exhibit B).

4. On or about March 15, 2002, a report was written and submitted to the Court in accordance with Sec., 17a-582, setting forth DMHAS' findings and conclusions as to whether the plaintiff was a person who should be discharged (Exhibit B).

5. The defendants are Alexander Carre, M.D., attending psychiatrist; Sean Hart, Psy.D (who signed for Dr. Mark Hillbrand); Susan McKinley, LCSW; and James J. Cassidy, J.D., Ph. D, Director of Whiting Forensic Institute (Amended Complaint).

6. The defendants signed and submitted th above report to the Court. The report consisted of an evaluation of the plaintiff's social/development history; medical history; family history; past psychiatric history; legal history; history of violent behavior; summary of previous evaluations; assessments; formulation; and conclusion (Exhibit B).

7. The defendants were assigned to the Diagnostic Evaluation Team, which was responsible for evaluating acquittees assigned to Unit # 3 of Whiting Forensic Division to determine whether they should be committed to the jurisdiction of the PSRB and, if so, to what level of confinement (Affidavits of Carre, Cassidy, Hart and McKinley, exhibit P, Q, R and S).

8. In the report, the defendants recommended that the plaintiff be committed to the jurisdiction of the PSRB and that he be confined under conditions of maximum security (Exhibit B).

9. The report was submitted to the Court on or about March 15, 2002 (Exhibit B).

10. The Court held a hearing in September of 2002 to consider the report (Transcript hearing Before The Honorable Lubbie Harper, Jr., September 26, 2002, hereinafter Exhibit J).

11. The Court (Harper, J.) Ordered that the plaintiff be committed to the jurisdiction of the PSRB at the maximum security setting of the Whiting Forensic division of the Connecticut Valley Hospital for a period not to exceed thirty-five years (Exhibit J).

12. The plaintiff filed an appeal with regard to the court's order of commitment, pursuant to Conn. Gen. Stat. Sec., 17a-582(g) (See Appellant's Brief, hereinafter Exhibit K).

13. On January 10, 2003, the PSRB held an initial hearing pursuant to Conn. Gen. Stat. Sec., 17a-583 to review the commitment of the plaintiff to the PSRB's jurisdiction (Memorandum of decision, dated February 21, 2003, hereinafter Exhibit C).

14. The plaintiff was represented by counsel at the hearing, and was provided an

opportunity to cross-examine witnesses (Exhibit C).

15.   Based upon the hearing, the board ordered that the plaintiff remain confined under conditions of maximum security at Whiting Forensic Institute on the grounds of Connecticut Valley Hospital (Exhibit C).

16.   The plaintiff appealed the order of the Board pursuant to Conn. Gen. Stat. Sec., 17a-597 (copy of the plaintiff's pending administrative appeal attached as Exhibit L).

17.   Pursuant to Conn. Gen. Stat. Sec., 17a-586, a report was submitted to the Board regarding the mental status of the plaintiff (A copy of the report, dated July, 2003, is marked as Exhibit D).

18.   Dr. Rathi stated that it was the unanimous opinion of the treatment team that he remain in the current setting of the Withing Forensic Division of Connecticut Valley Hospital (Exhibit D).

19.   On September 20, 2003, the plaintiff filed an application to reopen a hearing for reconsideration by the PSRB of its decision to confine the plaintiff to conditions of maximum security and an application for conditional release, pursuant to Conn. Gen. Stat. Sec., 17a-588(Exhibit E).

20.   Dr. Rathi submitted a report to the PSRB, dated October 23, 2003, regarding the plaintiff's application for conditional release (Exhibit F).

21.   Dr. Rathi opined that the plaintiff was not ready for conditional release into the community at the present time and it was recommended that the plaintiff remain confined at Whiting, while the hospital proceeded with considering that he be transferred to the less restrictive setting at Dutcher Hall, also located on the Connecticut Valley Hospital campus. The plaintiff's application for reconsideration was denied by the Board on October 6, 2003 (See Exhibit E).

22.   On November 13, 2003, a report was submitted to the Board by Dr. Rathi pursuant to Conn. Gen. Stat. Sec., 17a-599.   Dr. Rathi opined that the plaintiff cannot be adequately controlled with available supervision on conditional release from the hospital, or be discharged from the jurisdiction of the PSRB as he would constitute a danger to himself or others.   It was recommended that the Board consider the plaintiff to be an appropriate candidate for transfer to the enhanced security setting of the Dutcher service of the Whiting Forensic Division of Connecticut Valley Hospital (Exhibit G).

23.   A hearing regarding the plaintiff's application for conditional release, as well as a newly filed application for discharge, is scheduled for March 19, 2004 (Exhibit I).

None of the facts in the defendant's Rule 56(a)(1) statement and exhibits including the ones the plaintiff has omitted are relevant or are they genuine issues of material facts that "might effect the outcome of the suit under the governing law".

Non of the defendants Affidavits and/or defendants Exhibits state that the plaintiff suffers from a mental disease or defect that would justify his commitment under conditions of maximum security at Whiting

Forensic Institute. **1/**    According to silent facts on the record and also to Dr. Carre the plaintiff was "**an**

**exemplary patient**" from his initial commitment through the time the hospital submitted the report pursuant

Gen. Stat. Sec., 17a-582 . <u>DEFENDANTS EXHIBITS B & J</u>.  In fact defendant Carre , M.D., emphasized that he

would not expect violent type of behavior from the plaintiff because "**that is not his style.**"**1/** , 9/26/02 at

27, <u>DEFENDANTS EXHIBIT J</u>.


It is further testified to by defendant Carre, M.D., that "**in the absence of substance [use] I don't see why**

**[Mr. Kalman] would engage in violent behaviors to solve his problems.**" 9/26/02 at 29., <u>DEFENDANTS</u>

<u>EXHIBIT J</u>.    The evidence presented by defendants unequivocally demonstrates that the plaintiff is not

violent and he is not mentally ill to an extent which justifies confinement at Whiting. **2/**


Plaintiffs position also comports with the testimony provided by defendant Alexander Carre, M.D., "**Well,**

**I don't think Whiting is the only place that could take care of Mr. Kalman.**"1/10/03 at 22 lines 1-3,

hearing transcript before the PSRB, pursuant to Conn gen. Stat. Sec., 17a-583.  See <u>Plaintiffs Exhibit C.</u>

   When defendant  Carre, was asked about plaintiff's potential for violence and/or if Kalman is to be of

violent nature. Dr. Carre's response was "No." 1/10/03, p. 10 at 16-24.  Defendant Carre further emphasized

that "No, I - - I had made it clear that Mr. Kalman has never been violent on the unit." 1/10/03 p. 11 at 2 -

3. <u>Plaintiffs Exhibit C.</u>

---

1.    The plaintiff requests  the Honorable Court take judicial notice of Conn. Gen. Stat. Sec., 17a-599, that  requires the plaintiff
to be "**so violent**" as to warrant confinement in maximum security.   The word "violence [violent]" is defined as "moving, acting,
or characterized by physical force, especially by extreme and sudden or unjust or improper force." <u>Barons's Legal Guides, Law
Dictionary</u> .  Accordingly, for someone to be considered "violent" they must have engaged in an act using physical force.
2.    The plaintiff requests the Honorable Court to take further judicial notice that, under Conn. Gen. Stat. Sec., 17a-599 the word
"violent" is modified by "so," which means "to a greater extent or degree: very, or extremely...: to a definite but unspecified extent
or degree." <u>Merriam-Webster's Collegiate Dictionary.</u>  <u>Ballantine's Law Dictionary (Third Edition)</u> cross-references "violent" to
the word "violence".   The word "violence" is defined as "physical force applied so as to injure or damage."  The plaintiff's conduct
does not fit the statutory definition of "so violent" as testified to by defendant Carre, M.D.  (Allegation that mentally ill inmates were
knowingly housed with non-mentally ill in a high-security unit and that **caused dangerous conditions stated an Eight Amendment
claim against prison officials**) <u>De Mallory</u> v. <u>Cullen</u>, 855 F.2d 442, 444-45 (7th Cir. 1988); <u>Nolley</u> v. <u>County of Erie</u>, 776 F. Supp.
715, 738-40 (WDNY 1991); <u>Langley</u> v. <u>Coughlin</u>, 715 F. Supp. At 543-44; see, <u>Hassine</u> v. <u>Jeffes</u>, 846 F.2d 169,178 n. 5 (3d Cir.
1988) (prisoner could seek relief); <u>Jackson</u> v. <u>Indiana</u>, 406 U.S., 715, 738, 92 S. Ct.184 (1972); see, <u>O'Conner</u>  v. <u>Donaldson</u>, 422
U.S., 563 , 95 S. Ct. 2486 (1975) (Unjustified confinement in mental hospital is unconstitutional).

The defendants in their affidavits state their occupation, that plaintiff was evaluated at Whiting Forensic pursuant to Conn. Gen. Stat. Sec., 17a-582 and that the evaluation revealed that:

> "Mr. Kalman's psychiatric difficulties stemmed from his excessive and prolonged abuse of cocaine and alcohol."
> "His diagnosis was **cocaine and alcohol dependence, in remission in a controlled Environment, and** Adult Antisocial Personality Disorder." **3/**

Under Connecticut law "**mentally ill person**" "person with **psychiatric disabilities**" is someone who requires care and treatment due to an inability to live an active life (i.e. "**gravely disabled.**") as **a result of a serious mental or emotional impairment.** _Accordingly_, to recommend the Court that plaintiff be placed under maximum security conditions as an acquittee if so, the plaintiff must be gravely disabled/mentally ill, a person who has a "mental illness"/"psychiatric disabilities or is mentally retarded **to the extent** that his discharge **or conditional release** would constitute a danger to himself or others and **who can't be adequately controlled with available supervision and treatment on conditional release.**" (A gravely disabled person who has a mental condition that has substantial effects on his ability to function and "**who requires inpatient care and treatment and who cannot be controlled under less restrictive conditions.**")

Consequently, the controlling dangerousness standard requires a substantial risk that **physical harm will be inflicted by the acquittee upon himself or other due to a metall illness.** The substantive due process protection afforded by the Fourteenth Amendment "**bars certain arbitrary, wrongful government actions regardless of the [fairness] of the procedures used to implement them.**" Zinermon v. Burch, 494 U.S. 113, 125 (1990). In the present case, the defendants finding of mental illness rested solely on diagnosis of "Cocaine and Alcohol Dependence, in **Remission in a Controlled Environment**" **3/**

It is firmly settled that a person acquitted of a crime on the ground of mental disease or defect my be involuntarily held if, and only if, that person continues to be **both** mentally ill **and** dangerous. See, e.g., Jones vs. United States, 463 U. S. 354, 368 (1983); Foucha vs. Louisiana, 504 U.S. 71, 77 (1992).

3    Plaintiff's Axis II diagnosis of "Adult Antisocial Personality Disorder is not, as a matter of law, a diagnosis of mental illness which could support the defendants recommendation for a confinement order. See, Foucha vs. Louisiana, 504 U.S. 71, 75 (1992). The plaintiff does not dispute that Alcohol and Cocaine Dependence are psychiatric disabilities within the ambit of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. e.g., Hicks v. Frey, 992 F2d 1450, (6th Cir. 1993)("Extreme conduct by custodians that causes severe emotional distress is sufficient."); Kingsly v. Bureau of Prison, 937 F.2d 26, 32 (2d Cir. 1991); White v. Napoleon, 897 F.2d 103, 111 (3d Cir. 1990); Rhodes v. Chapman, 452 U.S. at 346, quoting **Trop** v. **Dulles**, 356 U.S., 86, 101, 78 S.Ct. 590 (1958).

7

The plaintiff respectfully requests this Court to take notice that the Connecticut General Statutes governing commitment to the Psychiatric Security Review Board and the Report that was submitted by the defendants pursuant to the statutory jurisdiction include the following controlling definitions:

> **"Person who should be conditionally released"** means an acquittee who has psychiatric disabilities or is mentally retarded to the extent that his final discharge would constitute a danger to himself or others and who **can be adequately controlled with available supervision and treatment on conditional release:**

> **"Person who should be confined"** means an acquittee who has psychiatric disabilities or is mentally retarded to the extent that his discharge or conditional release would constitute a danger to himself or others and who **cannot be adequately controlled** with available supervision and treatment on **conditional release**. See, Conn. Gen. Stat. Sec's., 17a-580 (9) and (10).

In the present case as employed by the defendants in the recommendation to the Superior Court, a diagnosis of substance dependance, especially substance dependance in remission while in a controlled environment, says nothing more that at some point in the past, i.e., prior to confinement, the plaintiff <u>was </u>dependant on cocaine and alcohol. *Plaintiff's position also comports with defendant Carre's testimony that plaintiff is* **"Certainly not mentally ill."** 87 at 6, <u>Plaintiff's Exhibit A</u>.


The diagnosis employed by defendants says nothing about plaintiff's mental condition (current/present) **<u>at</u> <u>the time of the commitment hearing</u>**, and supported nothing stronger than a surmise that if plaintiff was released from confinement and returned to a setting where alcohol and cocaine were available he might once again decide to abuse substances and become dependent on them.


As employed by the defendants, the mental illness diagnosis of substance dependence of alcohol and cocaine, to justify plaintiff's confinement clearly represents punishment for his past and potential further substance abuse/dependence, and would run afoul of the Eight Amendment to the United States Constitution.   The identified danger by defendants is that,  if  released from confinement, plaintiff <u>might</u> revert to the use or abuse of alcohol or cocaine, and <u>might</u> then engage in criminal conduct.

The Connecticut  Supreme Court recognized **"that the loss of liberty is all more profound when the**

8

institution to which the patient has been committed is a maximum security facility such as Whiting." Connally v. Comm'r of Correction, 258 Conn. 394, 405-406, 780 A. 2d 903 (2001).   Defendant's Motion for Summary Judgment fails because defendants failed to dispute any of the genuine  issues of material fact regrading the allegation that defendants recommended the plaintiff confined under conditions of maximum security without evidence that plaintiff is "an acquittee who has psychiatric disabilities or is mentally retarded to the [extent] that his discharge or conditional release would constitute a danger to himself or others and who cannot be adequately controlled with available supervision and treatment on conditional release."

The Motion for Summary Judgment must fail because decedents failed to dispute any of the genuine issues of material fact regarding the allegation that defendants recommended the plaintiff confined  under conditions of maximum security *not only without evidentiary support but also in direct contradiction to the evidence that plaintiff* "is **so violent** as to require confinement under conditions of maximum security."

Dr. Carre specifically testified that plaintiff is "**Certainly not mentally ill**."   The testimony from factual perspective, comports  with plaintiff's position alleged in his complaint that, in the circumstances of this case, the diagnosis of "*alcohol and cocaine dependence in remission*" and the "*adult antisocial personality disorder*" do not constitute "*psychiatric disabilities*" "*mental illness*" justifying  confinement under conditions of maximum-security.

The plaintiff submits that here, as in Foucha, his recommended confinement and continued commitment violates the due process requirement "that the nature **of commitment bear some reasonable relation to the purpose for which the individual is committed.**" Foucha, supra, 79.  The basis for plaintiff's acquittal was a disassociative state brought on by substances that was mis-diagnosed as a bipolar disorder and the

substance induced temporary condition was in ful remission during the evaluation.   Plaintiff's 'adult antisocial personality disorder' does not bear a reasonable relation to the mis-diagnosed bipolar disorder that provided the basis for the acquittal, thereby entitling him to discharge. Foucha, supra, 79. 4/    Indeed, this case provides an even stronger basis for discharge because, unlike Foucha, acquittee Kalman's adult antisocial personality disorder has not led to aggressive, violent behavior since his commitment. In essence, the defendant's found plaintiff Kalman *"not mentally ill"* but  curiously, recommended commitment and placement under conditions of maximum-security at Whiting.   Defendant's rational and recommendations are  irrational and  fundamentally unfair, punitive.    It is **"clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."** Foucha v. Louisiana, 504 U.S. 71, 80 (1992), quoting Addington v. Texas, 441 U.S. 418, 425 (1979)( holding Due

Process **mandates** clear and convincing **evidence** that an individual is **both** mentally **ill** and **dangerous to** justify civil **commitment,**); U.S. Const. Amend. XIV; Conn. Const., Art. 1, Sec.,8.

A genuine issue exists **"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."** Anderson vs. Liberty Lobby, Inc., 477 U.S., at 248 (1986).

---

4.   Baldwin v. PSRB, 776 P. 2d 577, 579-80 (ore. App. 1989). The acquittee was found not guilty by reason of mental disease or defect (MDD) based on "mixed personality disorder," and sought release because the MDD statute subsequently excluded personality disorders from MDD's justifying commitment. ORS 161. 295(2).  The Oregon Appellate Court had concluded that retroactive application of the statute excluding personality disorders controverted the legislature's intent because it "would make the reason for her commitment the reason for her release. Id., 579. ORS 161. 295(20 provides, in pertinent part: "the terms 'mental disease or defect' do not include an abnormality manifested only repeated criminal or otherwise antisocial conduct, nor do they include any abnormality, constituting solely a personality disorder."    In Foucha, the experts concluded that Foucha's APD was unprintable, i.e., permanent. Further, Hendricks, found that tractability is not a constitutional prerequisite to commitment. Hendricks, , 366.

Dr. Carre:   **"Certainly not mentally ill."** p., 87 at 6, - BEFORE THE HONORABLE BRUCE THOMPSON. JUDGE.
Dr. Carre: **"further observations over the next few months, it appeared to both treatment teams that Mr. Kalman had no significant psychiatric disorder that would drive him to be a danger to the community or himself."** 9/26/02 at 9, DEFENDANTS EXHIBIT J.

Dr. Carre:..he also states and I **agree** with him that he be **better off in a drug rehab center** rather then @ WFD since his problems center around his drug habits." CVH- PROGRESS NOTE, PLAINTIFF'S EXHIBIT D.
Dr. Scott: **"That does not place you under the board."** BEFORE THE HONORABLE BRUCE THOMPSON,  JUDGE.

The defendant's assert that the declaratory relief the plaintiff is seeking runs afoul of the Eleventh Amendment. As it is against the state through, state officials, and does not fall within the exception; i.e. seeking prospective injunctive relief against the state for alleged violations of the Federal Constitution. Defendants cite <u>Pennhurst</u> v. <u>State School and Hospital v. Halderman</u>, 465 U.S. 89, 121 (1984).

In <u>Kentucky</u> v. <u>Graham</u>, 473 U.S. 159, 105 S. Ct. (1985), "you can sue a state official, but not the State itself-for an injunction in their official capacity." In <u>Hughes</u> v. <u>Rowe</u>, 449 U.S. 5, 9, 101 S. Ct. 173 (1980); <u>Haines</u> v. <u>Kerner</u>, 404 U.S. 519, 520, 92 S. Ct. 594 (1972), "... courts generally hold pro se complaints to less stringent standards than formal pleadings drafted by lawyers." As Judge Nevas wrote in <u>D.P. Technology Corp.</u> V. <u>Sherwood Tool, Inc.</u>, "[A] court is under a duty to determine whether a plaintiff has a valid claim under any possible theory." <u>Id.</u> At 1039. In fact, pro se complaints are held to less stringent standards in this evaluation as to whether they state claims upon which relief can be granted. <u>Haines</u> v. <u>Kerner</u>, 404 U.S. 519, 520-521, 92 S.Ct. 594,595-596 (1972); <u>Ruark</u> v. <u>Solano</u>, 928 F. 2d 947,949 (10 th Cir. 1991); <u>Karim-Panahi</u> v. <u>Los Angeles Police Department</u>, 839 F.2d 621,623 (9 th Cir. 1988).

Under Rule 56 ( c ), summary judgment shall be granted to the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.
Show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law."

In fact the Affidavit of the first named defendant Alexander Carre, M.D., is in direct conflict with his testimony provided under oath BEFORE THE HONORABLE BRUCE W. THOMSON, Judge. See, <u>PLAINTIFF'S EXHIBIT A</u>, p. 87 at 6.

11

Moreover, this Honorable Court should take notice that the Affidavit's submitted by defendants Sean Hart, Psy.D., (who signed for Dr. Hillibrand); Susan McKinley, LCSW; and James J. Cassidy, J.D., Ph.D. Director, is also in direct conflict with the testimony provided by defendant Alexander Carre, M.D., under oath BEFORE THE HONORABLE W. THOMSON, Judge.

The defendants assert on page two of the Memorandum of Law in Support For Motion For Summary Judgment that:

> The most significant risk factor for Mr. Kalman is his diagnosis of Alcohol Dependence and Cocaine Dependence, particularly in light of his inability to remain substance free outside of a controlled environment, his inability to remain substance free even under controlled circumstances and his lack of any significant periods of substance free living. In addition, his lack of insight into these problems put him at great risk to abuse substances. What is likely to follow, given his history, is a pattern of erratic and impulsive behavior, which may be characterized by angry/hostile outburst, bizarre ideas and paranoid thinking. Exhibit B, p. 14.

In the conclusion of the report, based upon their professional judgment, the defendants opined that:

> [i]t is clear that Mr. Kalman has demonstrated a pattern of dangerous behaviors and social maladjustment that is highly correlated with *his severe and prolonged history of substance abuse.* Mr. Kalman has shown little or no insight into his substance abuse problems and has not evidenced any desire to change this behavior. Based on these findings, the opinion is offered that mr. Kalman would be a danger to the public if released. It is consequently recommended that a Mr. Kalman be committed to the jurisdiction of the Psychiatric Security Review Board for a period of time seen fit to be set by the court. Following a hearing on the above matter, it is also recommended that he be returned for placement at the maximum-security setting of the Whiting Forensic Division of Connecticut Valley Hospital. Exhibit B, pp. 14-15.

Recommending plaintiff's commitment and placement under conditions of maximum-security on the basis of "*his severe and prolonged history of substance abuse*" grossly and improperly deviates from the standard of mental illness that provided the basis for the acquittal. The defendants denied the plaintiff's right his right to substantive due process in concluding that "his severe and prolonged history of substance abuse" or "adult antisocial behavior" constitute mental illness/psychiatric disability justifying involuntary commitment and placement at Whiting. Foucha, supra, 77, 80.

12

Plaintiff's substance abuse/dependence in remission and/or adult antisocial personality disorder, while medically recognized, does not fall within the narrow category of psychiatric disabilities justifying involuntary commitment and placement under maximum-security conditions at Whiting.

The <u>Foucha</u> decision strongly suggests that a substance-induced psychosis in remission and a personality disorder is distinct from a mental disability justifying the continued involuntary commitment of acqiuttee. The United States Supreme Court's ruling also appears to reject the proposition that, for purposes of substantive due process, any mental disorder defined in <u>DSM</u> is a mental illness justifying involuntary commitment. Furthermore, the Supreme Court's decision makes clear that plaintiff's commitment must bear a reasonable relationship to the purpose for which he was committed. **Foucha** was found not guilty by reason of insanity of aggravated robbery and illegal discharge of a firearm. <u>Foucha</u>, supra, 73. Expert testimony concluded that, at the time of the crime, Foucha suffered **from a temporary substance-induced psychosis. <u>Id</u>., 74.**

At Foucha's discharge hearing, psychiatric experts reported that:

> (1) Foucha's **<u>drug-induced psychosis</u>, was in remission**;
>
> (2) Foucha had an **untreatable antisocial personality disorder** that was **not a mental disease**; and,
>
> (3) they would not certify that Foucha would not be a menace or dangerous to himself or others if released. Id., 74-75.

The plaintiff's diagnosis in the report written by defendants mirrors Foucha's. The Court stated in <u>Foucha</u> that; "due process requires that the *nature of commitment bear some reasonable relation to the purpose for which the individual is committed*." <u>Id</u>., 79. The forgoing language strongly supports the plaintiff's position that defendants fictitiously recommended <u>placement</u> under conditions of **maximum security.**

As observed by one commentator:

> Foucha certainly seems to be a **rejection of the notion** that any condition listed in the [DSM-IV] would suffice. After all, the DSM-IV lists the diagnosis "antisocial personality disorder," one of the personality disorders, as a mental [disorder]. *To allow* a professional association, **subject to the political pressures inherent** in any such organization, *to be the arbiter of what constitutes a justification for the deprivation of liberty would have been inconsistent with our constitutional scheme*. The Court in Foucha thus **suggested that not every psychiatric condition would justify civil commitment under the Constitution**, but it never clarified its constitutional holding. Bruce J. Winick, Special Theme: Sex Offenders: Scientific, Legal and Policy Perspective, 4 Psych. Pub. Pol. And L. 505511 (March/June, 1998); see Osborn v. PSRB, 934 P.2d 391, 403 (Ore. App. 1997) (indicating PSRB **improperly delegated its authority to the APA,** a non-public source, by adopting the "current [DSM]" definition, if "current" adopts DSM revisions).

The plaintiff respectfully submits that defendants report and recommendations submitted to the court is discriminatory in that it deprived the plaintiff of a meaningful review under principals of Due Process as required under the Fourteenth Amendment to the United States Constitution, that here , as in Foucha, defendants conclusions and recommendation for commitment violates the due process requirement "that the **nature of commitment bear some reasonable relation to the purpose for which the individual is committed.**" Foucha, supra, 79.

The plaintiff submits that the defendants simply found that plaintiff **has a [clinically] significant mental condition,** not a **legally significant [mental disorder] justifying a recommendation** of involuntary commitment. The defendants conclusion and recommendations erroneously conflates legally significant mental disorders and medically significant mental conditions: **a result condemned by both** the Psychiatric Community and the Judiciary, including the United States Supreme Court. Hendricks v. Kansas, 521 U.S. 346, 359 (1997)(Hendricks)( concluding that **"legal definitions of 'insanity' and 'competency'** vary substantially *from their psychiatric counterparts*" and "legal definitions, which must take into account such

issues as individual responsibility".)    Here, the defendants conclusion improperly imparts no distinction between medical health concepts and the *legally significant* mental state *required* for **commitment.** The authors of the DSM - IV *cautioned* the defendants that:

> *"in most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a 'mental disorder,' 'mental disability,' 'mental disease,' or 'mental defect.'" DSM-IV at xxiii.*

This cation stringently applies to mental conditions related to commitment.

Hendrick's clarifies Foucha by strongly suggesting that a personality disorder a volitional impairment rendering the individual unable to control dangerous conduct to satisfy the substantive due process requirements.  Hendricks rejected, inter alia, a substantive due process challenge to the Kansas Sexual ly Violent Predators Act* (te Act) pre-commitment condition of a "mental abnormality."  The Court first ruled that is "no talismanic significance" to the term "mental illness." Id., supra, 359.  Invalidating the Act's pre-commitment mental state, the Court said:

> It requires a finding of further dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' **that makes it difficult, if not impossible for the person to control his dangerous behavior**. The pre-commitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of these other statutes that we have upheld in that it ***narrows the class*** of persons **eligible for confinement** to those who **are unable to control their dangerousness**." (Emphasis added). Hendrick, supra, at 358

Notably the act's terms did not include the "*lack of volitional control*" or "*inability to control*" language repeated at least 9 times by the Court. Id., 351-61.  The Supreme Court also noted that "the Kansas statute linked the finding of dangerousness to the mental abnormality.  Similarly, our state requires a finding that the acquittee has psychiatric disabilities **"to the extent"** that discharge would constitute a danger. C.G.S. Sec., 17a-580 (10).   But Handrick imposed a critical third component the **lack of volitional control**.  Notably, the Court observed that "the law traditionally has considered this kind of abnormality akin to insanity for

purposes of *__confinement.__*" Id., 375.   In the present matter the defendants found no evidence of a disorder that caused a "*lack of volitional control*" or an "inability to control" dangerous behavior, thereby contravening Hendricks.

The finding of the defendants and all the clinical evidence supporting those findings, at most, demonstrates a possibility that plaintiff might decompensate into disassociative condition, upon a long exposure to the disinhibiting effects of alcohol and cocaine, should he resume their use, and while in such a state, might possibly present a risk of harm to himself or others.

Defendants recommendation of plaintiff's placement in maximum security is punitive, discriminatory clearly erroneous and is based on a string of completely unsorted suppositions that ultimately deprived the plaintiff of his liberty to be free from undue physical and mental restraint.

Defendants specifically state that "the opinion is offered that Mr. Kalman *would* be a danger to the public if released." Defendants Exhibit B, pp. 14-15. (P. # 3 Memorandum).

The defendants recommended maximum security placement without finding that maximum security placement is necessary without a finding that his  "**presence** in a non-maximum security setting poses an **imminent threat** to the **safety** or **well-being** of any **person**.  Dyous v. Psychiatric security Review Board, at 777;  264 Conn. 766 (2003), which dealt with the transfer of an acquittee by the PSRB to maximum security setting, Whiting; see also PSRB ADMINISTRATIVE REGULATION SEC., 17a-581-56(a) (*permitting transfer* to maximum security, absent a Court or PSRB order when "*the continued presence of the acquittee in a non-maximum security setting poses an immediate threat to the safety or well-being of any person.*").

16

The defendants determined that plaintiff is cognitively intact. SEE, DEFENDANTS EXHIBIT B. Moreover, defendants determined that plaintiff's personality disorder does not include a volitional impairment such that he lacks substantial capacity to control his conduct (as opposed to inability to control).

The incongruity between the statutory basis for acquittal and continuing commitment where the plaintiff is nether cognitively nor volitionally impaired regarding dangerous or unlawful conduct warrants discharge or reversal.

Consequently, to recommend plaintiff confined in maximum security the controlling dangerousness standard requires a substantial risk that physical harm will be inflicted by the plaintiff upon himself or others due to a mental illness /psychiatric disability. Plaintiff's position comports with our Supreme Courts ruling in Dous, supra 777; and also comports with Sec., 17a-581-56(a) "the continued presence of the acquittee in a non-maximum security setting *poses an immediate threat to the safety or well-being of any person.*"

The defendants failed to show in their Motion for Summary Judgment, and their Rule 56(a)(1) Statement in Support of its Motion for Summary Judgement, that there is no genuine issue as to any material fact that they are entitled to Judgement as a matter of law. A "material" fact is one that "might effect the outcome of the suit under the governing law...factual disputes that are irrelevant or unnecessary will not be counted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

The substantive due process protection afforded by the Fourteenth Amendment "bares certain **arbitrary, wrongful** government actions **regardless of the fairness of the procedures used** to implement them." Zinermon v. Burch, 494 U.S. 113, 125 (1990); e.g., Hicks v. Frey, 992 F2d 1450, (6 th Cir. 1993); Kingsley v. Bureau of Prisons, 937 F.2d 26, 32 (2 Cir. 1991); White v. Napoleon, 897 F. 2d 103, 111 (3d Cir. 1990); Rhodes v. Chapman, 452 U.S. at 346, quoting Trop v. Dulles, 356 U.S. , 86, 101, 78 S. Ct. 590 (1958); Humphrey v. Cady, 404 U.S. 504, 509 (1972); "that the loss of liberty is all the more profound when the institution to which the patient has been committed is a maximum security facility such as Whiting." Connelly v. Commr'r of Correction. 258 Conn. 349, 405-406, 780 A.2d 903 (2001); Hassine v. Jaffes, 846 F.2d 169,178n.5 (3d Cir. 1988)(prisoner could seek relief); O'Conner v. Donaldson, 422U.S., 563, 95 S.Ct. 2486 (1975)(unjustified confinement in a mental hospital is unconstitutional.) (Allegations that mentally ill inmates were knowingly housed with non-mentally ill in a high-security unit and that caused dangerous conditions stated an Eighth Amendment claim against prison officials), De Mallory v. Cullen, 855 F.2d855F.2d442,444-45(7 th Cir. 1988); Nolley v. County of Erie, 776F. Supp. 715, 738-40 (WDNY 1991).

POINT II

THE PLAINTIFF HAS STANDING TO SUE THE DEFENDANTS, BECAUSE THEIR CONDUCT CAUSED ACTUAL INJURY BY CAUSING THE PLAINTIFF TO BE CONFINED UNDER CONDITIONS OF MAXIMUM SECURITY WHERE HE COULD NOT BENEFIT FROM TREATMENT IN THE LEAST RESTRICTIVE ENVIRONMENT.   DEFENDANTS POSSESSED ACTUAL KNOWLEDGE OF IMPENDING HARM WHERE PLAINTIFF WAS CONFINED WITH THE MOST DANGEROUS AND VIOLENT MENTALLY ILL PATIENTS AT CONNECTICUT VALLEY HOSPITAL.

The defendant's Motion for Summary Judgment asserts that their argument is primarily based on the

principles of the Eleventh Amendment and applicable Immunities, and applicable principles governing the

issuance of declaratory judgment prevent the plaintiff's request for damages as well as his request for a

declaratory judgment.   The defendants assert that in essence the Eleventh Amendment prevents the award

of a declaration asserting that the prior conduct of state officials violated federal law.   The plaintiff is

seeking a declaration that his Federal Constitutional rights were violated under the Fourteenth Amendment

to the United States Constitution.   His allegations, which have never been disputed, include violations of

procedural as well as substantive due process.   In Paragraph 9 of his complaint, plaintiff alleged as the

grounds on which he is being held , that constitute a deprivation of liberty without Due Process that:

> "After concluding that the plaintiff does not suffer from mental disease or defect, the defendants went outside of the scope of the law, outside the scope of their duty, and recommended that the plaintiff be confined within the meaning of Connecticut General Statutes, Sections 17a-582 and 17a-580, paragraph 10, that the plaintiff was mentally ill "or mentally retarded to the extent that his discharge or conditional release would constitute a danger to himself or others, and who cannot be adequately controlled with available supervision and treatment on a conditional release."

The plaintiff respectfully submits in support of his complaint the following undisputed facts:

> "...CONCLUSION & RECOMMENDATION
> *Based on the information reviewed Mr. Kalman would not present a significant imminent risk to himself or others id D/C. In his current cognitively intact state he is able to reasonably describe how he would tolerate a wide variety of outcomes if D/C'd from returning home & being a care giver to his child, to returning to jail."*   PAUL AMBLE, M.D., 11/9/00

The acquittee was discharged from the WHITING FORENSIC DIVISION and:

> "....*started treatment on December 19, 2000 in our Dual Diagnoses Intensive Outpatient Program (three hours daily, three days per week) as well as individual therapy until October 5, 2001.."*
> ., HARBOR HEALTH SERVICES, INC .

> "... he also states and **I agree with him** that he be better off in a drug rehab center **rather than @ WFD since his problem center around his drug habits."**
> ALEXANDRE CARRE' M.D., - C.V.H.-PROGRESS NOTES.

18

**"...At the time of the examination the pt. did not exhibit overt signs of psychotic or clearly bipolar nature."** PAUL AMBLE, M.D., # 5882.

"He certainty shows no evidence of such disorder at present, and it is highly that what was thought to be manifested of this disorder in the past were actually resultant from his heavy use of cocaine and alcohol."
9/25 AT 10, DR. PETER ZEMAN, HEARING PURSUANT TO CONN. GEN. STAT. SEC., 17A-582

*"After the incident on unit 3 and subsequent transfer and further observations over the next few months, it appeared to both treatment teams that Mr. Kalman **had no significant psychiatric disorder that would drive him to be a danger to the community or himself**."*
9/26 at 9, ALEXANDER CARRE' M.D., HEARING PURSUANT TO CONN. STAT SEC., 17A-582

"[W]e have **not** found any significant evidence of a mental disorder. [W]e **simply** established the diagnosis of substance **use disorder** compounded with a personality disorder that put him at risk of offending in the community. Thank you."
ALEXANDRE J.R. CARRE' M.D., HEARING JANUARY 10TH, 2003, P. 7 AT 18 TO 22

"He doesn't *suffer from a major mental disorder* , yes." and  "**Certainly not mentally ill**"
ALEXANDRE CARRE' M.D., 12/17/02.

"Right. And with reasonable medical probability, I would say that it is unlikely that he is going to reach the level of an axis one."
**"That does not place you under the board"**
KEITH SCOTT, M.D., 12/16/02.

These facts - - or a fair reading of these facts are deemed true for the purpose of evaluating the defendants motion for summary judgment.    In the Report pursuant to Conn. Gen. Stat. Sec., 17a-582 to the Superior Court the defendants fictitiously stated and recommended that plaintiff needs placement and treatment under the most restrictive setting under conditions of maximum-security at Whiting.

In the above captioned matter now pending  before The Honorable Court, genuine issues exist as the **"the evidence is such that a reasonable jury could return a verdict for the nonmoving party."** Anderson vs. Liberty Lobby, Inc., 477 U.S., 248 (1986).

19

Dr. Zeman opined that the plaintiff had been mis-diagnosed.   Dr. Zeman explained that there was **"no perversive clinical evidence** that acquittee has suffered from a Bipolar Disorder.

He certainly shows **no evidence of such disorder at present**, and it is highly likely that what was thought to be manifestations of this disorder in the past **were actually resultant from his heavy use of cocaine and alcohol."** 9/25 at 10.

Further it was noted by Dr. Zeman that heavy cocaine use mimics the symptomology of Bipolar Disorder and that acquittee was under the influence of both alcohol and cocaine during his **"disorganized and frenzied behavior."** 9/25 at 10.

Pursuant to the nomenclature and criteria outlined in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV), which is published by the AMERICAN PSYCHIATRIC ASSOCIATION (APA), Dr. Zeman diagnosed the acquittee with alcohol and cocaine dependence, in remission in a controlled environment and antisocial personality disorder. 9/25 at 12-14.*

In addition Dr. Zeman testified that  acquittees threatening behavior resulted from his exorbitant use of alcohol and/or cocaine, not acquittees personality disorder. 9/25 at 16-17.

---

\*      **Martin** v. **PSRB**, 818 P.2d 1264, 1268 (**Ore. App. 1991**)(**PSRB does not have jurisdiction over one who suffers from personality disorder accompanied by a past or future possibility of decompensation into psychosis insufficient**)

\*\*    At most , "[t]he evidence establishes that there is a mere possibility, not even an expectancy, that [      ] could become dangerous again, and, then, only under certain circumstances."**Carlisle** v. **State**, 512 So. 2d 150, 160 (1987).

\*\*\*   **State v. Robin, 728 N.E.2d 736, 742 (Ill App. 2000)** (rejecting a **speculation, state's claim** that acquittee is dangerous because stress of entering community would cause decompensation into psychosis.)

In the matter of <u>State of Connecticut vs. Robert Kalman</u>, Docket No. CR 00 - 049130 S, submitted as

plaintiff's <u>Exhibit A.</u>, Before The Honorable Court.

## DIRECT EXAMINATION BY MS. FILAN, ASSISTANT STATE'S ATTORNEY

Q:       Are you familiar with - -withdrawn.
         Your testimony was that Mr. Kalman does not have an Axis one diagnosis , in other words, he
doesn't suffer presently from a mental illness, is that right?
A:       He doesn't suffer from a major mental disorder, yes.
Q:       Did he suffer from a major mental disorder , am I saying it right?
A:       (Indicating yes.)
Q:       In  2001 ?
A:       Well, major mental disorders do not disappear in time like that. Therefore, if you don't have a
major mental disorder in the year 2002, you couldn't possibly have one in the year 2001 or 2000.
Q:       Or 1999?
A:       Or 1999 I don't see how that could be done.
Q.:      Can you grow out of one ?
A:       Growing out of a major - - you could potentially, but it's little complicated to explain .There is a
Q:       Well, let me make it easier if I can.
A:       Yes.
Q:       With respect to Mr. Kalman at the age at which you know him, could he - - is it   possible to say
that someone this stage of life could grow out of a major mental disorder?
A:       Most likely not.          <u>Exhibit A. Transcript December 17, 2002 hearing , pages 71 - 72</u>

## REDIRECT EXAMINATION BY MS. FILAN
Q:       Is Mr. Kalman manipulative?
A:       Yes, I would believe that within that context one could safely say indeed he is manipulative
Q:       Manipulative but **not mentally ill**?
A:       **Certainly not mentally ill.\*    <u>December 17th 2002,  Dr. Carre'</u>**

---

**JUDICIARY - STATE CAPITOL - ROOM E - 53 - APRIL 1, 1985 - 12 : 00- NOON    \***
**MR. BIKLEN:**       The Commission drafted this bill with the help of a number of expert advisors, mental health people, public
defenders and prosecutors.   This gave the board some flexibility and some standards for releasing persons on a condition.  **If they
have proper medication, it's also less expensive for society that these persons were released into society under strict controls
rather than held in the hospital if they were the sort that were subject for release.**

I think a person cannot be released without some set of standards already set up. It is questionable today by statute whether a judge
can do that.   There are no standards.  This conditional release program standard is based on Oregon and they've had very good
success with that.  They haven't had problems with that particular provision.

**SEN. JOHNSTON:**   Are there standards in this bill for.

**MR. BIKLEN:**       It says the same thing. You have to be not dangerous to himself or to society based on his conditional release
if he's properly medicated for instance. Suppose every day you had to receive medication at an out-patient facility.

**SEN. JOHNSTON:**    Now you mentioned the Court but it is my understanding from reading the bill that a conditional release
would  be possible without involving the Court in that process.

**MR. BIKLEN:**       Yes, that's possible only, the Court would be involved on a final release decision.

21

In the matter of **State of Connecticut vs. Robert Kalman**, Docket No. CR 00 - 049130 S, submitted as

plaintiff's Exhibit C., Before The Honorable Court.

On December 16, 2002, testimony by Dr. Keith Scott, attending Psychiatrist.


CROSS   EXAMINATION   BY  MS  FILAN

A:        **I saw no evidence of that.**
Q:        Did you find that Mr. Kalman had a schitzoaffective axis one?
A:        Schitzoaffective .
Q:        Schitzoaffective disorder axis one?
A:        **I found no evidence of that**.
Q:        The delusional disorder that you raised as a possibility because delusional is a    subcomponent of antisocial personality, you raised it for the purpose of ruling it in or ruling it out.
A:        Yes.
Q:        As the doctor may look at a rash on the hand and say is it poison ivy or is it cancer?
A:        Correct.
Q:        Did you rule the delusional disorder in or out?
A:        Given the information that I had at the time, I said that he did not have. I did not   raise it to a level of the diagnosis.
Q:        So, you did not diagnose Mr. Kalman with any axis one diagnosis?
A:        Well, with the exception of the - -
Q.        Drugs?
A:        Drugs and alcohol, no.
Q:        All right. So, with the exception of drugs or alcohol, you did not diagnose him as mentally ill?
A:        That's correct.
Q:        Talk to us about axis one drug and alcohol diagnosis, if you will, it's on axis one, but it is mental illness, could you explain it?
A:        Well, actually being on axis one psychiatry would place it as a mental illness. I know there is a lot of controversy and discussion about whether or not it is or it isn't and the legal definition is quite different.
Q:        So, you could be mentally ill in the sense that your substance abuse dependant on either alcohol or drugs or both, but that **has a different legal result**, if you will?
A:        **That does not place you under the board. \***       **Dr. Scott.,   12/16/02**

---

\*  The substantive due process protection afforded by the Fourteenth Amendment **"bars certain arbitrary**, wrongful government actions `**regardless of the fairness of the procedures used to implement them'**. **Zinermon**  v. **Burch**, **494 U.S. 113, 125 (1990)."**
\*  Foucha, supra, 80. **"So-called ~substantive due** process' **prevents the government** from engaging in conduct that `**shocks the conscience,'** **Rochin** v. **California, 342 U.S. 165, 172 (1952)**, or interferes with rights `**implicit in the concept of ordered liberty,'** Palko v. **Connecticut, 302 U.S. 319, 325-326 (1937)."**
\* **United States** v. **Salermo, 481 U.S. 739, 746 (1987)**. Consistent with substantive due process protections an **"acquittee may be held as long as he is both mentally ill and dangerous, but no longer."** Foucha, supra, 77; see also Jones, at 370.

In the matter of PSRB, No. 0291. IN RE: ROBERT KALMAN, on January 10, 2003, at the Initial Commitment Hearing , pursuant to Conn. Gen. Stat. Sec., 17a-583, Alexander Carre' M.D.

Plaintiff's Exhibit B.,    Before The Honorable Court.

EXAMINATION BY GLENN M. CONWAY, ESQ.

Q:                     - - no problem. I' ll try - - I'll try it again. Let me just go in a deferent direction. Is there any diagnosis pertaining to Mr. Kalman that qualifies as a defense under Connecticut General Statutes 53a - 13 that you have discovered?
DR. CARRE':          The - - what is - - what is the statute, I'm not too - -
Q:                     It's a law - -
DR. CARRE':          Yeah.
Q:                     It's the - - it's the statute concerning the defense of mental disease or de defect.
DR. CARRE':          Uh - - huh.
Q:                      Are you familiar with the - -
DR. CARRE':          Yes - -
Q:                     Okay - -
DR. CARRE':          - - so your question is whether  - -
Q:                      Whether or not you've been able to diagnose Mr. Kalman with any disorder or illness that qualifies as a defense to criminal conduct pursuant to that particular statute?
DR. CARRE':          **No, I - - I have not. \*5**

---

\*     It is "clear that Commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Foucha vs. Louisiana, 504 U.S. 71, 80 (1992), quoting Addington vs. Texas, 441 U.S. 418, 425 (1979) (holding Due Process mandates clear and convincing evidence that an individual is both mentally ill and dangerous to justify civil commitment.); U.S. Const. Amend. XIV; Conn. Const., Art. 1, Sec., 8.

\*     The Constitution permits the Government, on the basis of the insanity judgment, to confine an acquittee to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society. Jones vs. United States, 463 U.S. 354, 370 (1983) (**insanity acquittal "justifies differing standards of proof:"** departure from Addington clear and convincing standard).

\*     In Foucha, supra, the State conceded the individual was no longer mentally ill, and sought to justify his continued detention based on his continuing dangerousness and antisocial personality. The Court adhered to the view that both mental illness and dangerousness are required , holding, "the acquittee may be held so long as he is both mentally ill and dangerous, but no longer." (Emphasis added.) Foucha 504 U.S. at 77 citing, O'Connor vs. Donaldson, 422 U.S. 563, 574-75 (1975)(holding due process violated where State continues to confine a harmless, mentally ill person). As a threshold matter, the acquittee does not disputes that alcohol and cocaine dependence are psychiatric disabilities within the ambit of the DSM - IV, and consequently represent "mental illnesses" within the meaning of the pertinent PSRB regulation. See, Regs., Conn. State Agencies, Section 17a-581-2 (a) (5).

\*     At present, acquittee Robert Kalman moved the PSRB, for conditional release from confinement (Conn. Gen. Stat. Sec., 17a-588), and the Constitutional legitimacy of Kalman's continued confinement thus requires that he is **both** mentally ill and dangerous. Foucha, supra, 77-78; Jones, 370. Our Supreme Court has adopted the forgoing principles for purposes of due process protection under the Connecticut Constitution. State vs. Metz, 230 Conn. 400, 417-18, 645, A.2d 965 (1994).

In an acqiuttee's commitment hearing pursuant to Conn. Gen. Stat. Sec., 17a-582, a "mentally ill person" is

one who has a mental condition that has substantial effects on his or her ability to function and who requires

inpatient care and treatment and who can't be controlled under less restrictive conditions. Consequently,

the controlling dangerousness standard requires a substantial risk that physical harm will be inflicted by the

acquittee upon himself or others.


It should be noted that on April 1, 1985, the Legislators were entertaining evidence from the agency heads

and persons in the government who were interested on the topics on the Agenda for the day.

REPRESENTATIVE ANDERSON, supported some changes to **House Bill** 5141.

> MR. BIKLEN:    "The Commission drafted this bill with the help of a number of expert
>
> advisors, mental health people, public defenders and prosecutors.   This gave the Board
>
> some flexibility and some standards for releasing persons on a condition.  If they have
>
> proper medication, it's also less expensive for society under strict controls **rather than be**
>
> **held in the hospital if they were the sort that were subject for release."**

THE LEGISLATURE'S  firmly expressed intent, that the adopted standards are tailored to the purpose of

commitment as the mental illness standard focuses on the effect that a mental or emotional condition has on

an individual's ability to function, and whether the individual requires care and treatment in confinement in

a psychiatric facility.

> It is established that:
> **In construing statutes,**
> > the fundamental objective is to ascertain and give
> > effect to the apparent intent of the legislature... In seeking to discern that
> > intent, [it is necessary to] look to the words of the statute itself, to the
> > legislative history and circumstances surrounding its enactment, to the
> > legislative policy it was designed to implement, and to its relationship to
> > the existing legislation and common law principals governing the same
> > general subject matter." (Citations omitted; internal quotation marks
> > omitted.) State v. Metz, 230 Conn. 400, 409, 645 A.2d 965 (1994).

At most , the evidence establishes that there is a mere possibility, not even an expectancy, that Kalman

could become dangerous again, and, then, only under certain circumstances.    That type of speculated dangerousness, doesn't rise to the level of, the dangerous type of behavior as defined dangerousness under the PSRB, statutory standard.    Based on the evidence there is nothing to rise to the level, that would justify defendants action in recommending confinement under conditions of maximum-security at Whiting and/or inpatient care or necessarily retention under the PSRB in order to protect society.

Plaintiff's adult antisocial personality disorder does not bear a reasonable relation to the mis-diagnosed bipolar disorder that provided the basis for the acquittal, thereby entitling him for discharge. Foucha, supra, 79.    In essence, defendants found the plaintiff "*certainly not mentally ill*" under the controlling law, but curiously not only without evidentiary support but in direct contradiction to the evidence, recommended that the plaintiff be placed under maximum security conditions at Whiting.

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248 (1986).

---

\*    Baldvin v. PSRB, 776 P. 2d 577, 579-80 (ore. App. 1989). The acquittee was found not guilty by reason of mental disease or defect (MDD) based on "mixed personality disorder," and sought release because the MDD statute subsequently excluded personality disorders from MDD's justifying commitment.   ORS 161.295(2).    The Oregon Appellate Court had concluded that retroactive application of a statute excluding personality disorders controverted the Legislature's intent because it "would make the reason for her commitment the reason for her release. Id., 579. ORS 161. 295(20) provides in pertinent part: "the term mental disease and defect **do not include an abnormality manifested only by repeated criminal conduct, nor do they include any abnormality, constituting solely a personality disorder."**

The plaintiff's position is also supported by the exclusion from the definition of mental disease or defect set forth in Conn. Gen. Stat. Sec., 53a-13( c ) that provides: "[a]s used in this section, the terms mental disease or defect do not include (1) **an abnormality manifested only by repeated criminal or otherwise antisocial conduct......"**

The defendants stated that the plaintiff's psychiatric difficulties *"steamed from his excessive and prolonged abuse of alcohol and cocaine."* DEFENDANT'S EXHIBIT J, at page # 1, Report pursuant to Sec., 17a-582. Additionally, the Defendants opined that plaintiff's **"primary diagnoses are substance-related,"** and that the plaintiff did not demonstrate *"evidence of a thought disorder or a mood disorder."*     Defendant Alexander Carre, M.D., testified that, up to the March 15th, 2002, submission of the Whiting Report, the plaintiff was an *"exemplary patient,"* who *"for the most part had exhibited no problems..., kept a very low profile on the unit, participated in most of the activities and pretty much caused no problem* until three months in to his hospitalization when he began to engage the treatment-various nursing staff members in a kind of **one-upmanship** aimed at either intimidating the various members or aimed at casting doubt on the content or the knowledge of the people who were observing him. In doing so, Mr. Kalman created a very difficult atmosphere. To such an extent that **the [administration decided] to transfer him from my unit**, which is unit 3 [diagnostic unit] to unit 2 [maximum security unit]." 9/26 at 7. DEFENDANT'S EXHIBIT J.


Defendant Alexandre Carre' Attending Psychiatrist on the Diagnostic Team, described the plaintiff's exercise of the grievance process as "antics."     Defendant Carre, M.D., described the plaintiff's "antics" in the following manner: "[acquittee] began his antics by engaging the treatment teams in one-upmanship battle. That started with his questioning the validity of his treatment or diagnosis and then by requesting to receive some specific treatment and to refuse those specific treatments that he had initially **[requested] to be transferred to unit 2.**

Further, his antics have consisted of enlisting the administration, enlisting the commissioner's help, the patient advocate, certain personalities that were well known nationally to intervene on his behalf and even then the requests were not very clear to me.

Their aim was to merely keep up the attention of one-upmanship, intimidation and trying to get away with certain advantages and privileges that other patients would not have. At least on one occasion on unit two

, it included but was not limited to having to have his way with **[the mailing process]** that we have

established for every body. So it has been a long series of chicanery of that sort where he would say well,

I don't agree with that, you're denying me my rights or the patient's rights. That created a sense of - well,

a sense of unwiseness, if you will, and distraction in the therapeutic milieu. (Emphasis added.) 9/26 at 25.

DEFENDANT'S EXHIBIT J..   The acquittee asks the Honorable court to take notice of the fact that Plaintiff's

Exhibit # 6, attached to Plaintiff's Affidavit states that:

> "...two (2) remaining grievance issues dates back to September 16 and 22,
>
> 2002. These issues are, as stated in your February 7 letter, "regarding
>
> access to **[the mail service]**" and "denied **access to the mail.**"
>
> My review of the remaining issues and my resolution efforts included
>
> meetings and/or conversations with Dr. Foster, Lt. Caron, Will Brady, and
>
> Carmen Abraham. These efforts revealed that at the time you filed your
>
> grievances in September 2002 there were problems with mail handling on
>
> unit 2......."

It should be noted that defendant Carre's testimony conflicts with Exhibit 6, and that Dr. Carre was a named

defendant in a civil action filed by the plaintiff in the J. D., of Middlesex at Middletown at the time he

testified at the commitment hearing on 9/26/02. The plaintiff is asking the Honorable Court to take notice

of plaintiff's exhibits 3, 4, 7,8 describing the findings of Federal and state Agencies at the Whiting Forensic

Division of C.V.H.


CRITICALLY, ALEXANDRE CARRE' FURTHER TESTIFIED:

"After the incident on unit 3 and subsequent transfer and **further observations over the next few months,**

**it appeared to both treatment teams that Mr. Kalman had no significant psychiatric disorder that**

**would drive him to be a danger to the community or himself.**     However, **given his antics** and his

behaviors and his use of substances it would remain he was considered a considerable risk to the community and not necessarily better managed by us." 9/26 at 9. DEFENDANT'S EXHIBIT J.    When the Court asked if Carre's main concern was plantiff's propensity for dangerousness, Carre' made clear that plaintiff's "propensity for dangerousness **was predicated on his relentless use of alcohol and cocaine.** That would drive his behavior to be potentially dangerous to himself or others." (Emphasis added.) 9/26 at 9. DEFENDANT'S EXHIBIT J.

Dr. Carre, like Dr. Zeman, testified that, since being committed, plaintiff has not engaged in any threatening, assaultive or otherwise dangerous behavior . 26-28. Further, in a June, 2002, C.V.H.-Progress Note, by Dr. Carre' agreed with the acquittee that treatment at a drug and alcohol rehabilitation center would be "**very beneficial**" for the acquittee, stating further that such treatment would be "**<u>far more beneficial</u>**" for the plaintiff than Whiting. 9/26 at 22, 28.

Critically, Dr. Alexandre Carre' added "that the main reason why [acquittee] started it all [,i.e.,"antics"] on Unit 3 had been that he felt that he didn't receive proper treatment with regard to his substance use."(Emphasis added.) 9/26 at 8 DEFENDANT'S EXHIBIT J.

In May and June of 2002 , the plaintiff requested pursuant to Department of Mental Health and Addiction Services Policy, that errors contained in the Medical Record be corrected.    The plaintiff was simply exercising a right and utilizing procedures provided by the D.M.H.A.S., and also provided by the Connecticut Valley Hospital.  The defendants failed to comply with clearly established policy and the plaintiff submitted a Grievance in accordance with the D.M.H.A.S.-Commissioner's Grievance Procedure.  The Defendant's and certain members of the Diagnostic Team took plaintiff's exercise of rights pursuant to policy personally, and defendant Carre, Attending Psychiatrist acted in an unprofessional manner and attempted to intimidate

28

the plaintiff, leaving him with no choice but to utilize the legal recourse provided by the CONNECTICUT

PATIENT BILL OF RIGHTS, codified in Connecticut General Statute section 17a-550.    At any rate, it should

be noted by this Honorable Court that defendant Alexandre Carre' M.D., specifically testified that, despite

plaintiff's "antics""it appeared to **both** treatment teams that Mr. Kalman had no **significant psychiatric**

**disorder that would drive him to be a danger to the community or himself.**" 9/26/02 at 9, DEFENDANTS

EXHIBIT J.    It is unrealistic to commit an individual under conditions of maximum-security for his exercise

of his **First Amendment** rights if that individual "*had no significant psychiatric disorder that would drive*

*him to be a danger to the community or himself.*" 9/26/02., DEFENDANTS EXHIBIT J.    Defendant Carre's

testimony comports, from a factual perspective, with plaintiff's position that , in the circumstances of this

case, the diagnosis of "**adult antisocial personality disorder**" does  not constitute a psychiatric disability

justifying involuntary commitment.    Such reasoning comports with defendant Carre's statement that, prior

to plaintiff's "**antics,**" substance abuse and alcohol rehabilitation would be "**far more beneficial**" for

plaintiff than confinement at Whiting.[ **9/26/02,**] at 22-23. DEFENDANT'S EXHIBIT J.*

\*The plaintiff respectfully requests this Honorable Court to take notice that in the  matter of State vs. Robert

Kalman , Docket No. CR00-0491390S, Alexander Carre, M.D., testified that Plaintiff is "**Certainly not**

**mentally ill.**" December 17th 2002.    The plaintiffs' allegation in his amended complaint also includes the

following:

- The defendants after concluding that the plaintiff is a non-violent individual had recommended in their report that the plaintiff shall be confined under conditions of maximum-security at the Whiting Forensic Division of Connecticut Valley Hospital. *Complaint at P. 10.*
- After the defendants concluded that the plaintiff was not violent, the defendants went outside the statutory scope of the law, outside the scope of their duty, and recommended that the plaintiff shall be confined under conditions of maximum-security, pursuant to Connecticut General Statutes, Section 17a-599. *Complaint at P. 11.*
- Defendant Carre testified that he did not fined any significant evidence of a mental disorder and that Kalman's mental status continued to remain stable even after a rather long period of not being on any psycho tropic medication, and was never violent on the unit.  *Complaint at P. 14.*
- Further defendant Carre testified that he would not expect the plaintiff to be violent and violence

29

"That is not his style."

- The plaintiff claims that due to the defendant's abuse in process and as a result of the defendant's recommendation the plaintiff remains confined in the maximum-security facility of Whiting Forensic Institute under conditions of maximum-security and is denied the benefit of services, programs and activities in the most integrated setting appropriate based on a finding and recommendation made by the defendant's that is not supported, by facts on the record that the plaintiff is so require a commitment under conditions of maximum-security. ........*Complaint* P., 18.

One more important concern this Honorable Court should take into consideration when making its decision on whether to grant the defendant's motion for summary judgment is that of plaintiff's liberty interest. Unlike a convicted criminal, an insanity acquittee has a higher liberty interest because an acquittee's degree of liberty, including unconditional discharge, is conditioned on his/her ability to regain sanity and reduce his/her level of dangerousness while under commitment.

When someone is placed in prison, they are placed there for a punitive purpose. When an individual is placed in a hospital, they are placed there for treatment.    Acquittee's ability to regain their liberty and or degrees of liberty is tied to legal standards whereas simple conditions of confinement issues are really Eighth Amendment issues and subject to much more discretion on the part of prison authorities.    Therefore, this Honorable Court cannot ignore the liberty interest of the plaintiff and should reject the defendant's motion for summary judgement.

Although this is not the appropriate moment to delve into these matters in depth, it should be noted that the defendants recommendation of maximum security placement for the plaintiff is an apparent contravention of the line of cases following Jackson v. Indiana, 406 U.S. 715, 92 S. Ct. 1845 (1972)(holding that different treatment of classes of mentally ill persons constituted violation of the equal Protection Clause, and that failure of commitment procedures to ensure that the nature and duration of commitment procedures bear some reasonable relation to the purpose of the commitment violates Due Process).

30

However inartfully pleaded by the pro se plaintiff in his pro se complaint, the complaint is adequate to

enable him to pursue his claim for relief.   Factual support includes an examination of plaintiff's Medical

Record as well as testimony provided under oath by defendant Carre M.D., and the underlying statutes used

to justify confinement of the plaintiff under the most restrictive conditions in maximum security.


The plaintiff alleges that under the Fourteenth and Eighth Amendments to the United States Constitution ,

his rights were violated.  The violations that he alleges are not state law violations, but are, Federal violations

of procedural and substantive due process in accordance with the Fourteenth Amendment.   A state law

creates a liberty or property entitlement if it limits the discretion of officials. Kentucky Dept. Of Corrections

v. Thompson, 490 U.S. 454, 462. 109 S.Ct. 1904 (1989).


The plaintiff is an acquittee who was found by the defendants  **"Certainly not mentally ill"** and not **"so**

**violent as to require confinement under conditions of maximum security."** Sec., 17a - 599, Conn. Gen.

Stat. The most common way of limiting official's discretion is by using mandatory language in connection

with requiring substantive predicates. Hewitt v. Helms, 459 U.S. 460, 472, 103 S.Ct. 864 (1983).  Mandatory

language often means words like "shall" "will" or "must". Hewitt v. Helms, 459 U.S. at371; see also Board

of Pardons v. Allen, 482 U.S. at 378 ("statutes with "shall" and "when" and "if" "when", or "subject to" have

the same effect as statutes with "shall" and "unless").

---

**The plaintiff respectfully requests The Honorable Court to take judicial notice that Conn. Gen. Stat.
Sec., 17a-599 applies to the report written by the defendants as is a statute within the jurisdiction of
the Psychiatric Security Review Board for two reasons.  First, Sec., 17a-599 is listed under Part V of
Chapter 319i entitled person with Psychiatric Disabilities.  Part V of Chapter 319i entitled Psychiatric
Security review Board  Part V of this Chapter lists all of the statutes pertaining to the PSRB.  Second,
Conn. Gen. Stat. Sec., 17a-582 is listed under Part V of Chapter 319i and Sec., 17a-599 sets forth the
procedural directions and substantive standard to be applied for determining when an acquittee (the
Plaintiff), should be confined in maximum security.**

Section 17a-599 of the Conn. Gen. Stat., contains mandatory language and a substantive predicate, "it shall make a further determination of whether the acquittee is so violent as to require confinement under condition of maximum security."   In order for the plaintiff's condition of confinement to qualify as a constitutional protected liberty, a Connecticut statute, judicial decree or regulation must assure the interest. <u>Wheway</u> v. <u>Warden</u>, 215 Conn. 418, 432 (1990).

The plaintiff has a protected liberty interest to be placed in the least restrictive environment.  Acquittee's have no recognized Federal Constitutional right to be placed in the least restrictive environment. <u>Kulab</u> v. <u>Berkelhammer</u>, 88 F.3d 63, 73 (2 nd Cir. 1996) "**However, a state may create such a liberty interest protected under the Fourteenth Amendment by regulations, statutes, or court orders mandatory in character.**"

A state may give rise to a liberty interest subject to due process protections based on the use of mandatory language coupled with "substantive predicates ", raising a presumption that a designated right or privilege will be granted when the designated findings are made. <u>Vincezno</u> v. <u>Warden</u>, 26 Conn. App. 132, 138-40, 599 A.2d 51 (1991), citing <u>Greenhotz</u> v. <u>Nebraska Penal Inmates</u>, 442 U.S. (1979) and Board of <u>Pardons</u> v. <u>Allen</u>, 482 U.S. 369 (1987); <u>Sandin</u> v. <u>Conner</u>, 515 U.S. 472, 479 (1995) "**[T]he word shall in the statute creates a legitimate expectation.**"  A liberty interest protected by the due process clause of the Fourteenth Amendment may arise out of state law. <u>Vitek</u> v. <u>Jones</u>, 445 U.S. 480, 488-90 (1990).

Genn. Stat. Sec., 17a-599 applies to the report written by the defendants and the statute is mandatory as includes the word "shall" in its directive.  Once the defendants determined that the acquittee is a person with psychiatric disabilities to the "extent" who should be confined, a further determination "shall" be made as to "whether the acquittee is so violent as to require confinement under conditions of maximum security."

32

As this statute is mandatory, it creates a right, a protected liberty interest of the plaintiff, to be confined in the least restrictive setting.   As such, a denial of this right would be a Constitutional deprivation.

Other states had found that a person is entitled to be confined to the least restrictive setting either through statute or common law.   The District of Colombia recognized that **"one who by reason of insanity is acquitted of a crime and...is committed to a mental hospital is entitled to not only treatment, but treatment in the least restrictive alternative consistent with the legitimate purposes of a commitment."** Jackson v. United States, 641 A2d 454, 457 (D.C., 19940.   The **"least restrictive language" means "that the treatment must be the best treatment for the acquittee that protects the public safety."** Id. (Emphasis added).


Illinois has codified a right to the least restrictive setting in Section 2-1029a0 of the mental health code which states that **"[a]recipient of services shall be provided with adequate and humane care and services in the least restrictive environment."** 405 ILCS 5/2-102(a) (2003). A 111 **"The mere fact that plaintiff's have been involuntarily committed as NGRI acquittees does not deprive them of substantive liberty interest under the Fourteenth Amendment.'** C.J. v. Dept. of Mental Health and Development Disabilities, 296 Ill. 3d 17, 27, 693 N.E. 2d 1209, 1215 (1998) (citing Vitek v. Jones, 445 U.S. 480, 491 (1979). **"Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action."** C.J., 693 N.E. 2d at 1215 (quoting Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1, 18 (1979) (Powell, J., concurring in part and dissenting in part).  Moreover, "[I]n Foucha v. Louisiana, U.S. Supreme Court recognized that freedom from bodily restraint is **a liberty interest that applies to insanity acquittees."** Foucha v. Louisiana, 504 U.S. 71, 80 (1992). C.J., 693 N.E. 2d at 1216.   Even when acquittees are found to be in need of a secure placement, the **"secure setting is in effect the least restrictive environment permitted for NGRI acquittees under the law..."** C.J., 693 N.E. 2d at 1213.

33

In New York, in the case of insanity acquittees, the Legislature has outlined procedures for insuring that people committed are not to be held in a secure facility when they can be safely treated in a less restrictive environment. People v. Betances, 176 Misc. 2d 66, 71, N.Y.S. 2d 930 (1998). "There is **no logical reason** to believe that, in prescribing care and treatment at an appropriate institution, **the legislature intended harsher treatment for a patient who is merely accused of a nonviolent criminal act, but not proven to have committed any crime at all, than one found not responsible by reason of mental disease or defect.**" Id.


In Vitek v. Jones, 445 U.S. at 445 U.S. at 483 n. 1. a statute provided that if a doctor finds that a prisoner has a mental disease or defect that cannot be treated in prison, the Director may transfer her for treatment. This language along with prison practice created an "objective expectation" that the prisoner would not be transferred unless a Doctor found that she had such a mental condition. Thus, a liberty interest was created. Accord, Mayes, v. Trammell, 751 F.2d 175, 178 (6 th Cir. 1984)(regulation stating that parole release "may" be denied "if" certain conditions exist is same as one saying parole "shall" be granted "unless" those conditions exist).


In the preset matter pending before The Honorable Court , defendant Alexander Carre testified under oath that the plaintiff is "Certainly not mentally ill." Defendant Alexander Carre further testified pertaining to **plaintiff's potential for violence,** "That is **not..**" the plaintiff's "**his style.**" The defendants in the report, not only without evidentiary support but in direct contradiction to the evidence, recommended that the be plaintiff placed under conditions of maximum security. The defendants denied the plaintiff procedural and substantive due process when they recommended the plaintiff be placed under conditions of maximum security absent any evidence that plaintiff was mentally ill under the controlling law, as well as absent any evidence that he was so violent, and strictly based on allegations that plaintiff was breaking hospital rules.

34

Defendant's decision was clearly erroneous in view of the reliable, probative, and substantive evidence on the whole record; the decision was arbitrary, punitive and/or capricious and/or characterized by abuse of the process; the decision contains no factual basis to support the defendant's decision and/or recommendation that Whiting Forensic is the least restrictive environment necessary for the plaintiff thereby depriving the plaintiff of the right to a meaningful review under principles of due process of law .

The evidence submitted before this Honorable Court, support an alternative cause of action - that of abuse of process.    A fair appraisal of the evidence leads to the conclusion that the plaintiff's proof spells out a cause of action for abuse of process.    The defendants determined that the plaintiff is not mentally ill and he is not violent, however under the pretext that plaintiff was acquitted pursuant to Sec., 53a-13, the defendant's facetiously reported to THE HONORABLE LUBBIE HARPER, JR, JUDGE, in the defendant's report dated March 15, 2002, recommending the plaintiff's placement in maximum-security as well as commitment to the Psychiatric Security Review Board.    The HONORABLE LUBBIE HARPER, JR, JUDGE, made the specific finding on facts that were presented in the Honorable Superior Court fictitiously

---

Abuse of process is defined by the Restraint, Torts, page 464, Sec. 682, in the following terms:

One who uses a legal process, **whether criminal or civil,** against another to accomplish a purpose for which it **is not designed is liable to the other for the pecuniary loss caused thereby.**

Prosser, supra, page 876, sec. 115 points out that abuse of process supplies a remedy that is denied under the theory of malicious prosecution.  Abuse of process lies in those instances where:

..... **legal procedure has been set in motion in proper form, with probable cause, and even with ultimate success, but nevertheless has been perverted to accomplish an ultimate purpose for which it was not designed.**

The gist of the tort is:
.....**misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used,..... is the only thing of importance. (Prosser, supra, p. 876, sec. 115.)**                 (Malice is not required.  Probable cause does not defeat the plaintiff's action, and there need not have been a termination in the plaintiff's favor.)    *** The plaintiff respectfully request this Honorable Court to take notice of the fact that  plaintiff has no access to a Law Library nor a Library in the building where he is detained.   Plaintiff made numerous written requests and oral requests to Unit Administrators and employees for permission to (see Exhibit attached to Affidavit), access the Library on campus but the repeated requests were not answered to.  Plaintiff lacks the resources and materials to adequately present his case.

35

by defendants in the report pursuant to Sec., 17a-582, as well in the testimony by the first named defendant Alexandre Carre, M.D.    THE HONORABLE TRIAL COURT made the finding on the fictitious facts presented by the defendants that had the purpose to detain the plaintiff in maximum security.

The facts that appear in the evidence and on record in the instant matter, is "...*evidence... such that a reasonable jury could return a verdict for the nonmoving party*." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248 (1986).

<u>CONCLUSION</u>

However inartfully pleaded by the plaintiff in his pro se amended complaint, the complaint is adequate to enable him to pursue his claim for relief. The defendant's bold conclusion that plaintiff here has not come close to making a showing that the evidence is such that a reasonable jury could return a verdict for plaintiff, pales before the facts and evidence now presented before The Honorable Court. For the reasons set forth herein, the plaintiff Robert Kalman respectfully prays The Honorable Court that Defendants Motion For Summary Judgement be denied.

Alternatively, the plaintiff respectfully prays The Honorable Court to reject defendants advances for abstention set forth in the motion for summary judgement, and enter an Order to Stay Action.

RESPECTFULLY SUBMITTED,

DATED: 08 - 16 - 04.

THE PLAINTIFF,<br>ROBERT KALMAN<br>BY, _____<br>ROBERT KALMAN<br>DUTCHER HALL - CONN. VALLEY HOSPITAL<br>P.O. BOX 351 SILVER STREET<br>MIDDLETOWN, CONNECTICUT, 06457

36

## CERTIFICATION OF THE SERVICE

I, Robert Kalman hereby certify that a true copy of the forgoing Memorandum Of Law and all accompanying

Exhibits were duly served by U.S. Mail, in accordance with Rule 5 (b)of the Federal Rules of Civil Procedure

postage prepaid on this 17th, day of August 2004 to:


Peter L. Brown
Assistant Attorney General

Kerry A. Colson
Assistant Attorney General

P.O. Box 120
55 Elm Street
Hartford, Connecticut 06141 - 120



August 17 th, 2004.


Robert Kalman
Dutcher Hall - Connecticut Valley Hospital
P.O. Box 351 silver Street
Middletown, Connecticut 06457
(860) 346 9514


37